**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**PATRICK D'ANTRE FLUKER**                                                           **PLAINTIFF**

**v.**                                            **CIVIL ACTION NO. 1:13-cv-521-MTP**

**RONALD KING and HUBERT DAVIS**                                         **DEFENDANTS**

<u>**OPINION AND ORDER**</u>

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [45].
Having considered the Motion, applicable law, and case record, the Court finds that the Motion
[45] should be granted.

**BACKGROUND**

On April 15, 2013, Plaintiff Patrick D'Antre Fluker, proceeding *pro se* and *in forma
pauperis*, filed his Complaint [1] pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  This
lawsuit arises from events which took place while Plaintiff was a post-conviction inmate at
South Mississippi Corrections Institution ("SMCI") in Leakesville, Mississippi.  Plaintiff is
currently incarcerated at Walnut Grove Correctional Facility ("WGCF") in Walnut Grove,
Mississippi.  In his complaint and as clarified in his testimony at the *Spears*[1] hearing, Plaintiff
asserts claims against Superintendent Ronald King and Deputy Warden Hubert Davis for
violations of his First Amendment right to free exercise of religion, the Religious Land Use and
Institutionalized Person Act ("RLUIPA"), and the Equal Protection Clause.

According to Plaintiff, for a period of time during his incarceration at SMCI, he was

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

housed in restrictive custody[2], a section of the prison reserved for inmates who violated prison rules. Inmates housed in restrictive custody have fewer privileges. Plaintiff alleges that while he was in restrictive custody, Defendants Ronald King and Hubert Davis implemented a new policy prohibited inmates in restrictive custody from attending activities outside of their unit, including religious services. Plaintiff alleges that the new policy prohibited him from attending Jum'ah services, Islamic prayer services observed on Fridays.

Plaintiff alleges that he spoke to Defendant King and requested that he be allowed to attend Jum'ah services, but Defendant King denied his request. Plaintiff also alleges that he filed a grievance requesting that he be allowed to attend Jum'ah services, but Defendant Davis denied his request.

Additionally, Plaintiff alleges that he, as a Muslim, experienced discrimination. According to Plaintiff, on January 16, 2013, restrictive custody inmates of the Jehovah Witness faith were allowed to attend services. Plaintiff also alleges that on March 27, 2013, certain restrictive custody inmates were allowed to attend "Kairos" services.

As relief, Plaintiff seeks to have the Court require Defendants to allow restrictive custody inmates to attend Jum'ah services. Additionally, Plaintiff seeks punitive damages. Defendants have moved for summary judgment, arguing that they are entitled to a judgment as a matter of law.

## STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment will be granted only when "the record indicates that there is 'no genuine issue as to any material fact and that the moving party is entitled to

---

[2] Plaintiff referred to restrictive custody as "C-Custody" or "close custody."

judgment as a matter of law.'" *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The Court must view "the evidence in the light most favorable to the nonmoving party." *Id.* However, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In the absence of proof, the Court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

## ANALYSIS

### Injunctive Relief

First, the Court will consider Plaintiff's claim for injunctive relief in the form of an order requiring Defendants to allow restrictive custody inmates to attend Jum'ah services. In their Motion for Summary Judgment, Defendants argue that because Plaintiff is no longer housed in restrictive custody and is no longer restricted from attending Jum'ah services, his claim for injunctive relief is moot. The Court notes that, after Defendants filed their Motion for Summary Judgment, Plaintiff was transferred to WGCF and is no longer housed at SMCI. *See* Notice [61].

The transfer of an inmate from an allegedly offending institution generally renders his claims for injunctive relief moot. *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). In order for Plaintiff's claim for injunctive relief to remain viable, he must establish a "demonstrated probability" or a "reasonable expectation" that he will be transferred back to restrictive custody at SMCI. *Id.* Plaintiff argues that "he may find himself back in C-Custody . . . ." Response [59]

at 6.  Plaintiff's argument, however, is merely speculation and does not establish a "demonstrated probability" or a "reasonable expectation" that he will be returned to restrictive custody at SMCI. *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (finding that "any suggestion of relief based on the possibility of transfer back . . . is too speculative to warrant relief"); *Davis v. Wall*, 1995 WL 136204, at *2 n.3 (5th Cir. March 9, 1995) (holding that an inmate's claim for injunctive relief relating to his religious rights was rendered moot by his transfer to another facility).  Thus, Plaintiff's claim for injunctive relief should be dismissed.

**Official Capacity Claims**

In addition to injunctive relief, Plaintiff seeks punitive damages against Defendants.  To the extent Plaintiff asserts claims for damages against Defendants in their official capacities, such claims fail.  The Eleventh Amendment to the United States Constitution  "bars an individual from suing a state in federal court unless the state consents to the suit or Congress has clearly and validly abrogated the state's sovereign immunity. *Kermode v. Univ. of Miss. Med. Ctr.*, 496 Fed. App'x. 483, 487 (5th Cir. 2012) (citing *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 336 (5th Cir. 2002)).  The State of Mississippi has not consented to this suit, and Congress has not acted to abrogate Eleventh Amendment immunity for Section 1983 purposes. *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir. 1986) ("Section 1983 does not override the Eleventh Amendment bar.").  Sovereign immunity extends to any state agency or entity deemed to be "an arm of the state," and MDOC is considered an arm of the State of Mississippi. *Perez*, 307 F.3d at 326; Miss. Code Ann. § 47-5-1; *Scott v. Miss. Dep't. of Corrs.*, 2006 WL 1666258, at *2 (S.D. Miss. June 12, 2006).  Thus, MDOC officers and employees are officers and employees of the state and are entitled to sovereign immunity from monetary

damages. *See Am. Bank and Trust Co. v. Dent*, 982 F.2d 917, 921 (5th Cir. 1993).  Even nominal and punitive damages are precluded by Eleventh Amendment sovereign immunity. *See Hafer Hafer v. Melo*, 502 U.S. 21 (1991).  Accordingly, Plaintiff's claims against Defendants in their official capacities will be dismissed.

**Individual Capacity Claims**

Plaintiff also asserts claims for damages against Defendants in their individual capacities. As previously mentioned, Plaintiff has asserted claims for violations of his First Amendment right to free exercise of religion, RLUIPA, and the Equal Protection Clause.

*First Amendment*

The Free Exercise Clause of the First Amendment requires the government to refrain from interfering with the religious beliefs and practices of individuals. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  As a prisoner, Plaintiff retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Therefore, a government regulation may interfere with the religious beliefs and practices of a prisoner if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Pursuant to *Turner*, courts consider four factors in deciding the reasonableness of a regulation: (1) whether there is a rational relationship between the regulation and the legitimate government interest asserted; (2) whether the inmates have alternative means to exercise the right; (3) the impact that accommodation of the right will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id*. at 89-90.  Courts must balance the inmates' right to free exercise of religion with the

interest of prison officials charged with complex duties arising from administration of the penal system.  Prison officials are afforded great deference in carrying out their complex duties. *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987);[3] *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).

The *Turner* factors are not weighed equally; the first factor is controlling. *See Scott v. Miss. Dep't. Of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992); *Mayfield v. Texas Dep't. of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008).  The record demonstrates that Defendants' policy prohibiting inmates in restrictive custody from attending activities outside of their unit, including religious services, is rationally related to legitimate penological interests.  In his affidavit, Defendant King states that "Close Custody offenders are the highest risk population inmates and pose a threat to the safety and security of the prison." *See* King Affidavit [45-3].  According to Defendant King, he denied Plaintiff's request to attend Jum'ah services "due to the fact that Offender Fluker had a poor record of institutional behavior and as a result was classified as Close Custody and housed in a restrictive unit with other like-classified offenders." *Id.*

Such concerns have been found to be legitimate penological interests.  A prisoner's right to free exercise of his religion "may be curtailed in order to achieve legitimate correctional goals or maintain prison security." *O'Lone*, 482 U.S. at 348.  "[T]he safety and security of the prison is a legitimate governmental interest, and keeping vulnerable or dangerous prisoners apart is a rational way to achieve this goal." *Fortner v. Lowndes County Adult Detention Center*, 2014 WL

---

[3] In *O'Lone*, the Supreme Court faced a situation in which policies adopted by prison officials prevented Muslim prisoners from attending Jum'ah services, and the Court held that it would not substitute its judgment on difficult and sensitive matters of institutional administration for the judgment of those charged with the formidable task of running a prison. 482 U.S. at 353.

3746642, at *3 (N.D. Miss. July 29, 2014) (holding that detention facility had a legitimate penological interest in prohibiting inmates in protective custody from attending religious services).

The other factors reinforce the relationship between the regulation and the penological interest.  Moving to the third factor, the record demonstrates that allowing restrictive custody inmates to attend Jum'ah services outside of their unit would have a serious impact on the prison's security.  According to MDOC policy, restrictive custody "requires close supervision where the offender must be under positive security control at all times." *See* MDOC Classification Plan [45-1] at 9-10.  Given the need to keep restrictive custody inmates segregated and under positive security control at all times, allowing them to attend Jum'ah services outside of their unit would place an undue burden on the prison and subject officers and inmates to a greater risk of harm. *See Fortner*, 2014 WL 3746642, at *3.  Moreover, prison officials are given particular deference in regard to security concerns. *Cutter*, 544 U.S. at 722-23

Turning to the second factor, Plaintiff has not alleged that prison officials have prohibited him for practicing his religion.  In fact, Defendant Davis informed Plaintiff that "you are absolutely free to exercise any religion or practice any faith you so choose as long as it is in your assigned housing unit." ARP Response [45-2] at 7.  According to Defendant King, Plaintiff was free to practice his faith in his cell or in his unit. *See* King Affidavit [45-3] at 2.  Plaintiff has failed to establish that he was deprived of all forms of religious expression. *See O'Lone*, 482 U.S. at 351-52 (upholding a regulation that prevented inmates from attending Jum'ah services, and recognizing that although there were "no alternative means of attending Jumu'ah [since] respondents' religious beliefs insist that it occur at a particular time," inmates were "not deprived

of all forms of religious exercise, but instead freely observe a number of their religious obligations").

Prison officials have legitimate security concerns over allowing restrictive custody inmates to attend Jum'ah services outside of their unit. Plaintiff has not offered ready alternatives that would alleviate those concerns, and the Court cannot easily discern alternatives which would allow restrictive custody inmates to worship with other inmate and assuage the prison officials' legitimate security concerns, given the need to keep restrictive custody inmates segregated and under positive security control at all times. Application of the *Turner* factors establishes that prohibiting inmates in restrictive custody from attending activities outside of their unit, including religious services, is reasonably related to legitimate penological objectives. Accordingly, Defendants are entitled to a judgment as a matter of law on Plaintiff's First Amendment claim.

<u>RLUIPA</u>

Pursuant to RLUIPA, the government shall not impose a substantial burden on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000bb. RLUIPA, however, does not authorize a private cause of action for compensatory or punitive damages against Defendants in their individual capacities. *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 331 (5th Cir. 2009), *affirmed*, 131 S.Ct. 1651 (2011). Accordingly, Defendants are entitled to a judgment as a matter of law on Plaintiff's RLUIPA claim.

<u>Equal Protection</u>

To establish a violation of the Equal Protection Clause, Plaintiff "must allege and prove

that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). "Discriminatory purpose in an equal protection context implies that the decision-maker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995). Prison officials, however, generally need not provide identical facilities or personnel for every religious group. *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

Plaintiff asserts that he was denied equal treatment based upon his Islamic faith. According to Plaintiff, on January 16, 2013, restrictive custody inmates of the Jehovah Witness faith were allowed to attend services. Plaintiff also alleges that on March 27, 2013, certain restrictive custody inmates were allowed to attend "Kairos" services. The record, however, demonstrates that Muslims were treated no differently than other religious groups.

According to SMCI Chaplain Kenneth Powell's sworn testimony, "c-custody offenders were not allowed to attend, and did not attend, Jehovah's Witness services on January 16, 2013 at SMCI pursuant to MDOC policy restricting c-custody offenders from activities with other non c-custody offenders." *See* Powell Affidavit [54-1]. In response, Plaintiff reasserts his allegation regarding the Jehovah's Witness services. *See* Response [58] at 2-3. To overcome summary judgment, however, Plaintiff may not rest upon mere allegations in his complaint but must set forth specific facts showing the existence of a genuine issue for trial. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). This requires Plaintiff "to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his . . . claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Plaintiff's unsubstantiated

assertion does not satisfy this burden. *See Turner*, 476 F.3d at 343.

Regarding the March 27, 2013, Kairos service,[4] Plaintiff provided a memorandum from Chaplain Powell which states,

> As for close custody offenders attending Kairos on March 27, 2013, you will find the roster enclosed with 42 offenders selected by the Warden and Deputy Warden with seven (7) close custody offenders in attendance.  The superintendent grants participation which would be covered under SOP 22-01-01, which is listed above. Note Kairos is open to all offenders of all religions.  Offender James Richards (76127) was a close custody Islamic offender present for Kairos Walk #13.

*See* Powell Memorandum [36-1] at 48-49.  In the memorandum, Chaplain Powell explains that MDOC SOP 22-01-01 grants prison officials discretion regrading the restrictions placed on restrictive custody inmates. *Id.*  MDOC SOP 22-01-01 states that "Close custody offenders may be restricted for security reasons from some or all work/program assignments, as well as from specific parts of the institution as deemed appropriate for security reasons by the superintendent/warden/designee of that institution." *Id.*

Thus, the record demonstrates that Plaintiff, on a single occasion, was treated differently than seven other restrictive custody inmates.  The record, however, does not support a claim that Defendants were motivated by invidious religious discrimination, as opposed to any other possible motivation.  The record shows that the Kairos service was open to inmates of all religions, and Defendants, in their discretion, granted seven restricted custody inmates, including one Muslim, permission to attend.  The record indicates that the denial of Plaintiff's request to attend services outside of restrictive custody resulted from Plaintiff's "poor record of institutional behavior" and not from religious discrimination. *See* King Affidavit [45-3].

---

[4] The Court notes that Plaintiff did not provide information regarding the content of the Kairos service/event.

Additionally, Plaintiff presented evidence which demonstrates that Defendants did not discriminate against Muslims.  Plaintiff submitted an affidavit from a Christian inmate which states that "Christians and Muslims both are being denied the rights to attend worship services here at S.M.C.I. which violates our First Amendment Rights of the United States Constitution." *See* Quartaveous Strickland Affidavit [20].  The record does not support a plausible showing of discriminatory intent.  Accordingly, Defendants are entitled to a judgment as a matter of law on Plaintiff's Equal Protection claim.

**Qualified Immunity**

Although Defendants have raised the defense of qualified immunity, "if it becomes evident that the plaintiff has failed to state or otherwise to establish a claim, then the defendant is entitled to dismissal on that basis." *Wells v. Bonner*, 45 F.3d 90, 93 (5th Cir. 1995) ("Before we determine whether the constitutional right asserted by a plaintiff [was] clearly established at the time the defendant acted[,] we must determine whether the plaintiff has asserted a violation of a constitutional right at all.") (internal quotations and citation omitted).  Because the Court finds that the Plaintiff's claims are not cognizable as constitutional claims, it need not address the issue of whether the Defendants are entitled to qualified immunity.

**CONCLUSION**

For the reasons stated above, the Court finds that Defendants' Motion for Summary Judgment [45] should be granted.

IT IS, THEREFORE, ORDERED that:

1.    Defendants' Motion for Summary Judgment [45] is GRANTED and this action is dismissed with prejudice.

2.    A separate judgment in accordance with Federal Rule of Civil Procedure 58 will

be filed herein.

SO ORDERED, this the 13th day of March, 2015.

s/ Michael T. Parker
United States Magistrate Judge